# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TERRIE CRAIG,  
          Plaintiff,

        vs.

COMMISSIONER OF  
SOCIAL SECURITY,  
         Defendant.

Case No. 1:14-cv-966

Beckwith, J.  
Litkovitz, M.J.

**REPORT AND  
RECOMMENDATION**

Plaintiff Terrie Craig, brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Supplemental Security Income ("SSI") disability benefits. This matter is before the Court on plaintiff's statement of errors (Doc. 10), the Commissioner's response in opposition (Doc. 15), and plaintiff's reply memorandum (Doc. 16).

## I. Procedural Background

Plaintiff was born in 1993 and was "a child under the age of 18" on January 27, 2011, the date she applied for SSI. Plaintiff turned 18 in June 2011 and was an adult at the time of the administrative law judge's ("ALJ") decision. Plaintiff alleges disability due to attention deficit hyperactivity disorder ("ADHD") and depression. (Tr. 176-82, 204). Plaintiff's application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before ALJ Deborah Smith. Plaintiff appeared and testified at the ALJ hearing. On July 25, 2013, the ALJ issued a decision denying plaintiff's SSI application. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

**II. Analysis**

    **A.  Legal Framework for Disability Determinations**

    To qualify for SSI as a child under the age of 18, plaintiff must file an application and be an "eligible individual" as defined in the Act.  42 U.S.C. § 1382(a); 20 C.F.R. § 416.202.  Eligibility is dependent upon disability, income, and other financial resources.  *Id.*  An individual under the age of 18 is considered disabled for purposes of SSI "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

    The Social Security regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

    1. Is the child is engaged in any substantial gainful activity?  If so, benefits are denied.

    2. Does the child have a medically severe impairment or combination of impairments?  If not, benefits are denied.

    3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix I of 20 C.F.R. pt. 404, subpt. P. 20 C.F.R. § 416.924(a)?  If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d).  An impairment which meets or medically equals the severity of a set of criteria for an impairment in the listings, or which functionally equals a listed impairment, causes marked and severe functional limitations.  20 C.F.R. § 416.924(d).

    In determining whether a child's impairment(s) functionally equal the listings, the adjudicator must assess the child's functioning in six domains:

    1. Acquiring and using information;

    2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and

6. Heath and physical-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).  To functionally equal an impairment in the listings, an

impairment must result in "marked" limitations in two domains of functioning or an "extreme"

limitation in one domain.  20 C.F.R. § 416.926a(d).  The relevant factors that will be considered

in making this evaluation are (1) how well the child initiates and sustains activities, how much

extra help she needs, and the effects of structured or supportive settings; (2) how the child

functions in school; and (3) how the child is affected by her medications or other treatment.  20

C.F.R. § 416.926a(a)(l)-(3).

An individual has a "marked" limitation when the impairment "interferes seriously with

[the] ability to independently initiate, sustain, or complete activities."  20 C.F.R. §

416.926a(e)(2)(i).  A "marked" limitation is one that is "more than moderate" but "less than

extreme."  *Id.*  An "extreme" limitation exists when the impairment "interferes very seriously

with [the] ability to independently initiate, sustain, or complete activities."  20 C.F.R. §

416.926a(e)(3)(i).  Day-to-day functioning may be "very seriously limited" when only one

activity is limited by the impairment or when several activities are limited by the impairment's

cumulative effects.  *Id.*

If the child's impairment meets, medically equals, or functionally equals an impairment

in the listings, and if the impairment satisfies the Act's duration requirement, then the child is

considered disabled.  20 C.F.R. § 416.924(d)(1).  If both of these requirements are not satisfied,

then the child is not considered disabled.  20 C.F.R. § 416.924(d)(2).

After attaining the age of 18, to qualify for SSI, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.920(b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the

claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] was born [in] . . . 1993 and was therefore in the "Adolescents (age 12 to attainment of age 18)" age group on January 27, 2011, the date the application was filed (e.g., 20 CFR 416.926a(g)(2)(v)). The [plaintiff] attained age 18 [in] . . . 2011 (20 CFR 416.120(c)(4)).
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since the date the application was filed (20 CFR 416.924(b) and 416.972).
>
> 3. Before attaining age 18, the [plaintiff] had the following severe impairments: attention deficit and hyperactivity disorder (ADHD); an anxiety disorder; a personality disorder; an affective disorder; and borderline intellectual functioning (20 CFR 416.924(c)).
>
> 4. Before attaining age 18, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Part A or B (20 CFR 416.920(d), 416.924, 416.925 and 416.926).
>
> 5. Before attaining age 18, the [plaintiff] did not have an impairment or combination of impairments that functionally equaled the listings (20 CFR 416.924(d) and 416.926a).
>
> 6. Because the [plaintiff] did not have an impairment or combination of impairments that met, medically equaled any listing or functionally equaled the listings, the [plaintiff] was not disabled prior to attaining age 18 (20 CFR 416.924(a)).
>
> 7. The [plaintiff] has not developed any new impairment or impairments since attaining age 18.
>
> 8. Since attaining age 18, the [plaintiff] has continued to have the same severe impairment or combination of impairments (20 CFR 416.920(c)).

9. Since attaining age 18, the [plaintiff] has not had an impairment or combination of impairments that meets or medically equals a listed impairment (20 CFR 416.920(d)).

10. After careful consideration of the entire record, the undersigned finds that, since attaining age 18, the [plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels subject to the following non-exertional limitations. The [plaintiff] should not do a job that requires reading, writing, or doing math. The [plaintiff] is limited to simple, routine, and repetitive tasks without strict production quotas. The [plaintiff] similarly cannot perform piecework, cannot work on a team, and cannot do fast paced work. The [plaintiff] is limited to simple decision-making and use of judgment. The [plaintiff] requires a work environment with no more than occasional changes and she should work in only one job location. The [plaintiff] cannot have any contact with the general public, while her contact with coworkers and supervisors must be infrequent and minimal (no more than occasional).

11. The [plaintiff] has no past relevant work (20 CFR 416.965).

12. The [plaintiff] is currently a "younger individual age 18-44" (20 CFR 416.963).

13. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 416.964).

14. Transferability of job skills is not an issue because the [plaintiff] does not have past relevant work (20 CFR 416.968).

15. Since attaining age 18, considering the [plaintiff]'s age, education, work experience, and residual functional capacity, jobs have existed in significant numbers in the national economy that the [plaintiff] has been able to perform (20 CFR 416.960(c) and 416.966).[1]

16. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since June 7, 2011, the day the [plaintiff] attained age 18, through the date of this decision (20 CFR 416.924(a) and 416.920(g)).

(Tr. 18-37).

In determining that Plaintiff's impairments were not functionally equivalent to a listed

impairment, the ALJ found:

---

[1]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform 4,600 medium, unskilled, jobs in the regional economy, such as an industrial cleaner or a floor waxer. (Tr. 37, 67).

1. Before attaining age 18, [plaintiff] had less than marked limitation in acquiring and using information. (Tr. 22-23).

2. Before attaining age 18, [plaintiff] had less than marked limitation in attending and completing tasks. (Tr. 24-25).

3. Before attaining age 18, [plaintiff] had no more than a marked limitation in interacting and relating to others. (Tr. 26-27).

4. Before attaining age 18, [plaintiff] had no limitation in moving about and manipulating objects. (Tr. 27-28).

5. Before attaining age 18, [plaintiff] had no limitation in the ability to care for herself. (Tr. 28-29).

6. Before attaining age 18, [plaintiff] had no limitation in health and physical well-being. (Tr. 29-30).

**C. Judicial Standard of Review**

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Educational Records and Medical Evidence

#### 1.  Educational records

In 2000 at the age of 7, plaintiff's IQ was tested.  She obtained a verbal IQ score of 71, a performance IQ score of 91, and a full-scale IQ score of 78 on the Wechsler Intelligence Scale for Children—Third Edition ("WISC-III").  (*See* Tr. 282).

In October 2003 when plaintiff was 10, IQ testing yielded a verbal score of 59, a performance score of 79, and a full-scale score of 67 on the WISC-III.  (Tr. 368).  School psychologist Kelly Pennington indicated that plaintiff's verbal and full scale scores fell within the intellectually deficient range of ability.  (Tr. 368-69).  Plaintiff's full scale score indicated that she was functioning at the first percentile compared to her same age peers, and her verbal score indicated that she was functioning at the 0.3 percentile.  (*Id.*).  Wechsler Individual Achievement Test II scores yielded "Extremely Low" scores, which placed plaintiff in the first and less than 0.1 percentiles in relation to her peers.  (Tr. 370).  Plaintiff's speech and language skills were also assessed.  Speech pathologist Michelle Law concluded that plaintiff's social skills were "not age appropriate," noting that she had "difficulty with initiating communication

8

appropriately including greetings and closings, turn taking, remaining on topic, and asking/ answering questions appropriately." (Tr. 371). Specifically, Ms. Law indicated that when asked a question, plaintiff "responds by saying 'I don't know.'" (*Id.*).

In August 2006, school psychologist Matt Williams reviewed plaintiff's IQ scores from 2000 and 2003 and concluded that plaintiff "will perform academically at a level significantly below that of same-aged peers." (Tr. 502). He opined that the IQ results "are still considered to be an accurate measure of [plaintiff's] intellectual functioning and performance in the classroom" and plaintiff's "cognitive ability will likely have an adverse effect on her academic performance." (*Id.*).

In March 2007, when plaintiff was 13 years and 8 months old and in the eighth grade, she was administered the Woodcock-Johnson Test of Achievement ("WJTA") and scored in the "Very Low" range in all subject areas. (*See* Tr. 373-74). Specifically, she received a basic reading score of 37, a reading comprehension score of 44, a math calculation score of 68, a math reasoning score of 66, and a written expression score of 40.[1] (Tr. 374). These scores indicated that she was performing at a first grade level in reading and writing and a fourth grade level in mathematics. (*See* Tr. 377). Educational diagnostician Cathy Lentes administered the test and indicated in her report that she believed the test results were "valid and reliable, as [plaintiff] put forth sufficient effort under adequate testing conditions to assure the results obtained are an accurate representation of her academic skill." (Tr. 373). Ms. Lentes concluded that plaintiff's "academic skills, and her fluency with those skills, are negligible." (Tr. 377). Plaintiff's composite scores on the Vineland Adaptive Behavior Scales ("VABS") was in the "Moderately

---

[1] This test has a mean score of 100 and a standard deviation of 15. (*See* Tr. at 373).

Low" range of functioning at the seventh percentile.  (Tr. 381).  Plaintiff received all her academic instruction in a self-contained special education classroom setting.  (Tr. 378-79).

In December 2008 when plaintiff was 15, plaintiff's special education teacher Dawn Eick indicated that plaintiff could not independently perform the following adaptive behavior activities in the area of communication:  (1) understand what is spoken to her; (2) deliver messages; (3) state date of birth; (4) use irregular plurals or verbs; (5) read newspapers and magazines; (6) write in cursive; (7) follow oral instructions; (8) relate experiences; (9) give complex directions; (10) follow written directions; (11) write address; (12) express thoughts orally; (13) ask for needed clarification; (14) state address or phone number; (15) read for fun; (16) use dictionary or index or table of contents; and (17) write reports or compositions.  (Tr. 508).  In the area of independent functioning, Ms. Eick indicated that plaintiff could not independently perform the following activities:  (1) cover mouth and nose when sneezing; (2) understand dangerous situations; (3) practice personal hygiene; (4) weigh self using a scale; (5) care for hair and fingernails; (6) use cleaning supplies; (7) tell time; and (8) state current date.  In the area of socialization, Ms. Eick indicated that plaintiff could not independently perform the following activities:  (1) show interest in others' activities; (2) apologize for mistakes; (3) use conversational skills; (4) follow rules in games; (5) have a hobby; (6) cooperate with others she does not like; (7) share; and (8) introduce herself to strangers.  In the area of self-direction, Ms. Eick indicated that plaintiff could not independently perform any of the listed activities, which include the following:  (1) work hard on tasks not liked; (2) complete homework; (3) keep money in a safe place; (4) organize tasks; (5) control anger when another person breaks rules; (6) stop fun activity cooperatively when told time is up; (7) complete tasks without needing constant monitoring; and (8) initiate activities.  Ms. Eick noted that as to many of the tasks in the

10

self-direction area, plaintiff copied the work of others.  In the area of money handling and functional math, Ms. Eick indicated that plaintiff could not independently perform the following activities:  (1) write checks; (2) count change; (3) perform basic math calculation; (4) set budget for one week; (5) make purchases; (6) use banking facility; (7) use ruler/tape measure; (8) shop for others; (9) balance accounts; and (10) use measuring cup.  Finally, in the occupational/ employability area, Ms. Eick indicated that plaintiff could not independently perform the following activities:  (1) work cooperatively with others; (2) ask for help if needed; (3) accept suggestions; (4) set reasonable goals; (5) be productive; (6) follow instructions; (7) be dependable; and (8) take care of materials.  Ms. Eick concluded that plaintiff had deficits in all adaptive behavior areas assessed.  (*Id.*).

In a March 2009 assessment, Ms. Eick indicated that plaintiff did not display the following skills:  (1) stay on task; (2) return to work if distracted; (3) locate materials; (4) begin work promptly; (5) care for supplies; (6) ask before using another's property; (7) complete work on time; (8) work at a reasonable speed; (9) finish tasks without breaks; (10) not be frustrated with new tasks; (11) solve problems; (12) check work for errors; (13) accept and follow suggestions; (14) follow written directions; (15) ask for help; (16) work well with others; (17) take turns; (18) use everyday manners and appropriate language; (19) set short term goals; (20) plan activities; (21) work without having to be prompted; (22) ask for additional work; (23) know when work is well done; (24) work to improve skills; and (25) accept praise.  (Tr. 511). Ms. Eick opined that plaintiff "will need a lot of help" to live independently as an adult.  Ms. Eick also indicated that plaintiff "needs to understand what a goal is, how to attain it, and to ask for help," and that "she will need help in understanding the difference between reality and how she perceives daily situations."  (*Id.*).

11

Plaintiff continued to receive services and academic instruction in the special education category of Cognitive Disability in the ninth grade.  (Tr. 500).  Plaintiff, who was 15 years old, demonstrated significantly delayed cognitive and academic achievement scores which fell at a percentile rank ranging from 10 to 0.1, indicating "severe delays."  (Tr. 501).  Plaintiff demonstrated "severe and significant deficits in adaptive behavior and communication for a student of her age."  (*Id.*).  Because she was struggling academically and socially in her current classroom placement, placement in another academic environment was considered.  (*Id.*).  Following a re-evaluation for her IEP in April 2009, plaintiff was determined to meet the definition of a student with a disability under the category of Multiple Disabilities.[2]  (Tr. 514).

In June 2010, Intervention Specialist Joyce Ritchie, plaintiff's tenth grade teacher, assessed that plaintiff's skills were satisfactory in the following areas:  (1) personal grooming; (2) food preparation; (3) school related leisure; (4) crafts/hobbies/games; (5) integration with typical peers; (6) conversation; and (7) asking for assistance and expressing needs.  (Tr. 287).  However, Ms. Ritchie indicated that plaintiff needed improvement in the following areas:  (1) family life and health; (2) sight word recognition; and (3) home related leisure.  Further, Ms. Ritchie indicated that plaintiff was still learning skills in the following areas:  (1) laundry and clothing care; (2) cleaning; (3) neighborhood and community leisure; (4) shopping; (5) banking; (6) community mobility; and (7) individual job placement.  (*Id.*).  Ms. Ritchie noted that plaintiff was working at Good Laundry, where she was placed for one hour each school day during her tenth grade year.  (*See* Tr. 287, 302).  Ms. Ritchie indicated that plaintiff's

---

[2] "Multiple Disabilities means concomitant impairments, the combination of which causes such severe educational needs that they cannot be accommodated in special education programs solely for one of the impairments."  (Tr. 257).

adaptive/employability/social skills were satisfactory and opined:  "[Plaintiff] has very good job skills.  She is a very good organizer and carries a task to completion."  (Tr. 288).

In the eleventh grade, as part of her IEP, plaintiff was placed in a Multiple Disabilities (MD) classroom in another school district where she received accommodations of instruction in a small group setting, individual one-on-one instruction, extended time on all academic activities, and the services of a scribe.  (Tr. 274-76, 294, 303, 304).  Plaintiff's Multiple Disabilities classroom had 8 students and 2 teachers.  (Tr. 218).  She received specialized instruction with an adaptive curriculum, including instruction in daily living skills and functional academics.  (Tr. 299).

The March 2011 questionnaire completed by Intervention Specialist Carolyn Kitts, plaintiff's eleventh grade teacher, ranked problems in functioning on a scale of one to five, with a ranking of one representing "no problem," and a ranking of five representing "a very serious problem."  (*See* Tr. 219).  In the area of acquiring and using information, Ms. Kitts indicated that plaintiff has a very serious problem with (1) reading and comprehending written material and (2) expressing ideas in written form.  Ms. Kitts indicated that plaintiff has "a slight problem," or a ranking of two, with (1) understanding school and content vocabulary; (2) comprehending and doing math problems; (3) learning new material; (4) recalling and applying previously learned material; and (5) applying problem-solving skills in class discussions.  Ms. Kitts indicated that plaintiff has no problem with (1) comprehending oral instructions; (2) understanding and participating in class discussions; and (3) providing organized oral explanations and adequate descriptions.  (*Id.*).  She also reported that plaintiff was "in a self-contained classroom with 7 other students."  (*Id.*).  She stated that plaintiff was only able to read 100 of the 230 basic sight words and due to her inability to read, plaintiff was unable to write legible sentences.  (*Id.*).  In

13

the area of attending and completing tasks, Ms. Kitts indicated that plaintiff had no problem with

any of the listed activities except that plaintiff had a serious problem on an hourly basis (the

highest frequency an assessor could choose) with completing class/homework assignments.  (Tr.

220).  Ms. Kitts indicated that due to plaintiff's inability to read, assignments must be read to her

or modified for her to understand.  (Id.).

In the twelfth grade when plaintiff was 18, she continued receiving special education

instruction in the Multiple Disabilities classroom.  (Tr. 351).  She received the same

accommodations as in the eleventh grade.  (Id.).  Plaintiff's oral reading and comprehension

were at a lower second grade level and her math computation and comprehension were at an

eighth grade level.  (Tr. 346, 349, 350).  She was excused from the consequences of not passing

the Ohio Graduation Test and participated by taking the "Alternate Assessment" during the

school year.  (Tr. 354).  School records note that plaintiff's "curriculum is significantly altered

from her peers."  (Id.).

## 2.  Medical evidence

In November 2006, when plaintiff was 12 years old, she was evaluated by Earl Stump,

Ph.D.  (Tr.  408-11).  Plaintiff reported that she had been suffering symptoms of depression and

anxiety, with auditory and visual hallucinations and panic symptoms.  She had nightmares "that

won't go away."  (Tr. 408).   Plaintiff struggled with some social skills.  Dr. Stump diagnosed

Depressive Disorder, NOS and rule out a Post-Traumatic Stress Disorder (PTSD).  Dr. Stump

assigned a GAF score of 50.[3]

---

[3] A GAF score represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") (4th ed., text rev. 2000) at 32.  The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning."  Id.  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  Id. at 34.  Individuals with GAF scores of 41 to 50 have "[s]erious symptoms (e.g.,

In November 2007, plaintiff was evaluated by Chantel Dearth, Ph.D., for psychoeducational testing to assist with education planning.  (Tr. 383).  Plaintiff reported ongoing difficulties with depressed affect, irritability, difficulty concentrating, difficulty learning and understanding academic material, hearing voices, and temper outbursts.  She endorsed few friends and preferred to spend time alone, outside, or engaged with animals.  (Tr. 384). Plaintiff's mother reported that plaintiff struggled with a learning disability since kindergarten. *Id.*  Plaintiff endorsed being unable to read and often feeling frustrated to the point of giving up in the classroom.  *Id.*  Dr. Dearth administered the Stanford Binet Intelligence Scales - Fifth Edition ("SBIS")[4] which resulted in a full scale IQ score of 79.  (Tr. 384-85).  Dr. Dearth found that the results of the current evaluation suggest plaintiff functions in the borderline to low average range intellectually, relative to other teenagers her age.  Her academic performances were significantly below average for her age and educational level.  She demonstrated particular deficits in the areas of reading and written expression.  Dr. Dearth found that plaintiff's endorsement of "significantly greater than average difficulties in cognitive function, academic performance, oppositional attitudes and limit testing, family discord, psychological distress, social withdrawal, social skills, and social awareness" was consistent with plaintiff's prior clinical presentation.  (Tr. 386).  Dr. Dearth found that plaintiff's "affective and behavioral symptoms [are] likely to impact her functioning in the home and school environment."  (*Id.*).  Dr. Dearth diagnosed plaintiff with major depressive disorder, recurrent and oppositional defiant disorder.  Dr. Dearth also indicated that plaintiff's experience of hearing voices could suggest

---

suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-IV at 34. *Id.*

[4] Scores on the SBIS have a mean of 100 and a standard deviation of 15.  (*See* Tr. at 384).

either "intrusive thoughts or early psychotic symptoms." (*Id.*).  Dr. Dearth noted that plaintiff demonstrated clinical deficits in attention that are likely to further undermine her academic performance.  Dr. Dearth concluded that plaintiff "is likely to acquire new skills much more slowly than her peers and to require greater repetition of information in order to retain knowledge." (Tr. 387).

Consultative examiner, Nicole A. Leisgang, Psy.D., evaluated plaintiff on July 10, 2008, for disability purposes.  (Tr. 460-65).  Dr. Leisgang noted that plaintiff's "tested academic abilities range from the extremely low to borderline range." (Tr. 460).  Dr. Leisgang administered the WISC-IV which resulted in a full scale IQ of 44, falling in the extremely low range of intelligence or at about the second percentile for her age group.  (Tr. 463).  Dr. Leisgang stated that "[t]est data suggests that [plaintiff] is moderately mentally retarded but emotional and very likely motivational factors may have interfered with her performance as she appeared to be of low to average intelligence." (Tr. 464).  Dr. Leisgang diagnosed plaintiff with ADHD and a mood disorder and assigned a GAF score of 51.[5]  (Tr. 464-65).  Dr. Leisgang concluded that plaintiff's cognitive abilities and social/emotional patterns fall at a level that would be two-thirds or less of what would be considered age appropriate.  Her attention, concentration, persistence, and pace in task completion fall at a level that would be one-half or less of what would be considered age appropriate.  (Tr. 465).

Plaintiff was evaluated a second time for disability purposes on April 27, 2011, by Thomas L. Heiskell, Ph.D.  (Tr. 467-74).  Dr. Heiskell noted that plaintiff's mother "described dissociative features, but did not appear to recognize their importance." (Tr. 468).  Dr. Heiskell

---

[5]Individuals with GAF scores of 51 to 60 have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

indicated that plaintiff "presented as an irritably distant, persistently agitated teenage girl who continually appeared on the edge o[f] refusing to continue with the interview and testing, tolerating both only with great difficulty." (Tr. 469). During the examination, plaintiff "was persistently on the edge of angry eruption, when not appearing vulnerably distant and sad." (*Id*.). Her eye contact was "both hard and vulnerable, looking sad when she didn't adopt a protectively hard expression." (*Id.*). Plaintiff reported obsessive and compulsive symptoms and recurrent intrusive traumatic memories or experiences. (Tr. 470). Plaintiff's short-term memory was poor, as she recalled only one of three words after a five minute delay and "recalled only 2 digits forward and 2 digits in reverse, appearing to have a great deal of difficulty focusing." (*See* Tr. 471-72). She "had difficulty focusing on the meaning of questions and was progressively concrete, having difficulty giving vocabulary definitions if the word did not specifically apply to her and she understood it." (Tr. 472). IQ testing yielded a verbal score of 68, a perceptual reasoning score of 65, a working memory score of 58, a processing speed score of 50, and a full-scale score of 55 on the Wechsler Adult Intelligence Scale ("WAIS"). (Tr. 467, 471). Dr. Heiskell opined that plaintiff's IQ scores "are considered to be valid insofar as they represent her current status. However her level of emotional distress was so extreme her ability to perform cognitively was impaired. Underlying intellectual functioning likely optimally falls in the borderline range. . . ." (Tr. 472). Dr. Heiskell assigned plaintiff a GAF score of 30[6] and diagnosed her with PTSD, dissociative identity disorder, obsessive-compulsive disorder ("OCD"), ADHD NOS, and personality disorder NOS—with very prominent borderline personality disorder features. (*Id.*). Dr. Heiskell opined that because of her emotional distress,

---

[6] A GAF score of 21 to 30 is indicative of behavior "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM-IV at 34.

plaintiff has difficulty with carrying out basic instructions and "shows no dependable ability to carry out multiple instructions." (Tr. 473). Based on his examination, Dr. Heiskell opined that plaintiff would have difficulty in maintaining attention and concentration, maintaining persistence and pace, and performing tasks. He indicated that plaintiff "can perform tasks with which she is familiar, such as those involved in saddling and riding a horse and caring for her dogs," but noted that plaintiff "had extreme difficulty completing both testing and today's interview, appearing consistently on the edge of losing her temper and leaving, forcing herself to continue and being able to do so only with careful pacing." (*Id.*). Dr. Heiskell noted that plaintiff did not routinely perform significant parts of caring for her horse and that she "shows interference from her OCD behaviors." (*Id.*). Dr. Heiskell concluded that plaintiff would not be able to respond appropriately to supervisors and coworkers because she "shows extreme hostility and vulnerability towards others" and she "trusts almost no one and related here in a regressively vulnerable fashion." (*Id.*). Further, Dr. Heiskell opined that plaintiff "clearly would respond very oppositionally and potentially, and likely, very aggressively to authority figures." (*Id.*). Dr. Heiskell concluded that all of plaintiff's "symptoms and deficits lead to her having no dependable ability to cope with normal work pressures without becoming aggressive." (*Id.*).

Plaintiff received treatment from Shawnee Mental Health Center from April 2012 to February 2013. (*See* Tr. 520-36). Therapist Jan Oliver reported that plaintiff's affect was flat, her insight and judgment were fair to poor, her behavior was restless and apathetic, her mood was depressed and irritable, and her attention and concentration were impaired. (Tr. 533). Ms. Oliver further indicated that plaintiff's thought processes were somewhat slowed and "[c]oncentration appeared decreased and questions were repeated or her mother provided the answers." (*Id.*). Ms. Oliver assigned plaintiff a GAF score of 45 and diagnosed a mood disorder

18

NOS, a sibling relational problem, and a phase of life/religious/spiritual problem. (Tr. 536). On psychiatric examination by David Helm, M.D., plaintiff's mood was agitated, angry, dysphoric, and hypomanic; her affect was appropriate, exaggerated, reactive, and labile; her insight and judgment were poor; her thought content was paranoid; and her thought processes were appropriate, goal oriented, and sequential. (Tr. 525). Dr. Helm prescribed Depakote. (Tr. 526). At a follow-up appointment Dr. Helm noted that plaintiff had not felt any mood quieting effects from Depakote. (Tr. 524). Depakote was then discontinued after plaintiff became pregnant. (*See* Tr. 523). Ms. Oliver reported no change in plaintiff's mental status at follow-up therapy sessions in January and February 2013. (Tr. 520-21).

Ms. Oliver completed a questionnaire concerning plaintiff's mental impairments in April 2013. (Tr. 537-42). Ms. Oliver concluded that plaintiff was "unable to meet competitive standards" in dealing with the stress of semiskilled and skilled work. (Tr. 539). Ms. Oliver opined that plaintiff had none to mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and four or more episodes of decompensation within a 12-month period, each of at least two weeks' duration. (Tr. 540).

### E. Specific Errors

On appeal, plaintiff contends the ALJ erred by failing to find that her intellectual impairment meets or equals the requirements for an intellectual disability under Listing 112.05 for children and Listing 12.05 for adults. Plaintiff also argues that the ALJ was biased against her application and failed to fully and fairly develop and consider the evidence; failed to properly evaluate her credibility and symptoms; and erred at Step 5 of the sequential evaluation process

by finding that she could perform unskilled work in a position that requires occasional contact with coworkers and supervisors.  (Doc. 10).

**The ALJ's finding that plaintiff's intellectual impairment does not meet or equal the requirements for an intellectual disability under child Listing 112.05 and adult Listing 12.05 is not supported by substantial evidence.**

"Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.  *See also id.* § 112.05.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

B.  A valid verbal, performance, or full scale IQ of 59 or less;

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05. *See also id.* § 112.05.[7]

In finding that plaintiff's impairments did not meet or equal Listing 112.05 or 12.05, the ALJ concluded there was no valid IQ score to satisfy the listing requirements because "there is absolutely no reliability in the claimant's intelligence testing, which strongly indicates that motivational factors greatly determine test outcomes for the claimant." (Tr. 19). Noting that plaintiff obtained a full scale IQ of 79 on the SBIS in November 2007 and a full scale IQ of 44 on the WISC-IV in July 2008, the ALJ determined that "[t]here is no medical basis for such a precipitous drop in test results, especially not in that short period." (*Id.*). Instead, the ALJ concluded that the lower IQ scores were attributable to "lack of effort and motivation." (*See id.*). The ALJ also found that "the examiners that documented low IQ scores refused to diagnose the claimant with mental retardation and instead noted that she functioned within the borderline to average range of intelligence." (*Id.*). Further, the ALJ found that under Listing 12.05, "there is effectively no change in that analysis now that the claimant has reached adulthood." (Tr. 31).

Plaintiff argues she meets the listing requirements of significantly subaverage general intellectual functioning and deficits in adaptive functioning before age 22, which the ALJ did not dispute. However, plaintiff contends the ALJ erred by acting as "her own lay medical expert in

---

[7] Listing 112.05, the listing for intellectual disability for children under 18, provides in part:

> **Intellectual disability**: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.

> The required level of severity for this disorder is met when the [following] requirements . . . are satisfied.
> . . . .
> C. A valid verbal, performance, or full scale IQ of 59 or less; or

> D. A valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing an additional and significant limitation of function. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05C, D.

21

determining that [plaintiff's] low [IQ] scores are unreliable." (Doc. 10 at 15-16). Plaintiff contends that she consistently received qualifying IQ scores below 70, receiving a full scale score of 67 in 2003, a full scale score of 44 in 2008, and a full scale score of 55 in 2011. (*Id.* at 16). Plaintiff contends the ALJ's reliance on an outlier full scale IQ score does not constitute substantial evidence to reject the listing level IQ scores consistently found by other mental health professionals. (*Id.* at 18). Plaintiff also contends the ALJ exaggerated plaintiff's alleged "lack of effort" in testing and the record indicates a consistent pattern of low intelligence scores on objective testing accompanied by erratic emotional problems that interfered with her functioning. (*Id.* at 16).

The Commissioner responds that the wide range in plaintiff's IQ scores, including "scores of 44 and 79 obtained within a matter of months of each other," is an indication that the lower test scores are not reliable. (Doc. 15 at 14-15). The Commissioner argues that while Dr. Heiskell opined that the test he administered in 2011 was valid, he was not aware of plaintiff's previous tests in 2007 and 2008, and he declined to diagnose an intellectual disability. Rather, Dr. Heiskell opined that plaintiff's "intellectual functioning likely optimally falls in the borderline range." (*Id.* at 17, citing Tr. 472). The Commissioner contends that the ALJ was "not playing doctor by summarizing and noting inconsistencies in the medical records, as well as explaining gaps in the evidence." (*Id.* at 18).

The undersigned concludes the ALJ's determination that plaintiff does not meet or equal Listings 12.05 and 112.05 is not supported by substantial evidence. The ALJ relied on three factors in making this determination: the "unreliability" of the IQ test results; the perceived lack of motivation during testing; and recent IQ scores "near the upper end of the borderline range." (Tr. 19). The ALJ's reliance on these factors is without substantial support in the record.

For purposes of Listings 12.05 and 112.05, the Social Security regulations direct that the lowest score of an IQ test's multiple components be used:  "[W]here verbal, performance and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(D)(6)(c).  *See also id.* § 112.00(D)(9).  A good IQ test should exhibit "reliability, i.e., the consistency of results obtained over time with the same test and the same individual."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(D)(5)(c).  *See also id.* § 112.00(D)(8).  "IQ test results must also be sufficiently current for accurate assessment."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10).  The regulations explain:

> Generally, the results of IQ tests tend to stabilize by the age of 16.  Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior.  IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above.

*Id.*  "Test results obtained at younger ages are less reliable and valid than test results obtained at older ages."  POMS § DI 24515.055(A).

Here, the record reveals that plaintiff's IQ was tested on five occasions.  First, in September 2000 when plaintiff was 7 years old, she received a verbal score of 71, a performance score of 91, and a full-scale score of 78 on the WISC-III.  (*See* Tr. 282).  No contemporaneous report or discussion of these scores exists in the record.

Second, in October 2003 when plaintiff was 10, she received a verbal score of 59, a performance score of 79, and a full-scale score of 67 on the WISC-III.  (Tr. 368).  School psychologist Kelly Pennington indicated that plaintiff's verbal and full scale scores fell within the intellectually deficient range of ability.  (Tr. 368-69).  Plaintiff's full scale score indicated

23

that she was functioning at the first percentile compared to her same age peers, and her verbal score indicated that she was functioning at the 0.3 percentile.  (*Id.*).

In 2006, as part of plaintiff's IEP evaluation, school psychologist Matt Williams reviewed the 2000 and 2003 IQ tests and opined that the tests "suggest that [plaintiff] will perform academically at a level significantly below that of same-aged peers" and "[h]er cognitive ability will likely have an adverse effect on her academic performance."  (Tr. 282).

Third, in November 2007 when plaintiff was 14 years and 5 months old, she obtained a verbal IQ score of 77, a nonverbal IQ score of 83, and a full-scale IQ score of 79 on the SBIS.  (Tr. 384-85).  Dr. Dearth believed that given plaintiff's "effort and level of engagement with the evaluation," her findings "provide a reliable estimate of [plaintiff's] current functioning in the areas examined."  (Tr. 384).

Fourth, in July 2008 when plaintiff was 15 years and 1 month old, she received a verbal comprehension score of 53, a perceptual reasoning score of 57, a working memory score of 50, a processing speed score of 53, and a full-scale score of 44 on the WISC-IV.[8]  (Tr. 460, 463).  Dr. Leisgang reported that plaintiff's full-scale IQ score fell in the "extremely low range of intelligence."  (Tr. 463, 465).  Dr. Leisgang noted that plaintiff's tested IQ was "significantly lower" than that found in 2000 and 2003, but that "[t]he scatter in her subtest scores falls within acceptable limits."[9]  (Tr. 463).  Dr. Leisgang opined that plaintiff's "tested IQ is much lower than would be expected given her clinical presentation.  Emotional and very likely motivational

---

[8]The verbal comprehension score on the WISC-IV is the functional equivalent of the verbal IQ on the WISC-III, and the perceptual reasoning score on the WISC-IV is the functional equivalent of the performance IQ on WISC-III.  *See Fatheree v. Colvin*, No. 1:13-cv-01577, 2015 WL 1201669, at *10 (E.D. Cal. Mar. 16, 2015) (and cases cited therein).  *See also Richardson v. Colvin*, No. 2:13-cv-101, 2014 WL 2507927, at *9 (E.D. Tenn. June 4, 2014).

[9] Dr. Leisgang's report does not indicate that she was aware of plaintiff's November 2007 test results.

factors may have interfered with her performance as she appears to be of low to average intelligence." (*Id.*).

Fifth, in April 2011 when plaintiff was 17 years and 10 months old, she received a verbal score of 68, a perceptual reasoning score of 65, a working memory score of 58, a processing speed score of 50, and a full-scale score of 55 on the Wechsler Adult Intelligence Scale ("WAIS"). (Tr. 467, 471). Dr. Heiskell opined that plaintiff's IQ scores "are considered to be valid insofar as they represent her current status. However her level of emotional distress was so extreme her ability to perform cognitively was impaired. Underlying intellectual functioning likely optimally falls in the borderline range. . . ." (Tr. 472).

In this case, the ALJ focused on plaintiff's test scores from 2007 and 2008 in finding plaintiff did not meet the listings. (Tr. 19, citing Tr. 384-84, 463-64). Yet, of plaintiff's five IQ tests, the only test considered sufficiently current under the regulations is that performed by Dr. Heiskell in April 2011 when plaintiff was 17 years and 10 months old. (*See* Tr. 471); *see* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10) ("IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior."). Plaintiff's IQ scores (verbal of 68 and full-scale of 55) meet the threshold IQ requirements for Listings 12.05B and C and 112.05C and D. (Tr. 472). Plaintiff's next most recent testing with Dr. Leisgang occurred in July 2008 when plaintiff was 15 years and 1 month old and was only current until July 2010. (*See* Tr. 460); 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10). Plaintiff's testing with Dr. Dearth, on which the ALJ relied in disregarding plaintiff's other test scores, occurred in November 2007 when plaintiff was 14 years and 5 months old and was only current until November 2009. (*See* Tr. 383); 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10). Although Dr. Heiskell's

April 2011 IQ test results were the only sufficiently current results under the regulations, the ALJ

relied on the November 2007 test results to find plaintiff did not meet Listings 12.05 and 112.05.

The ALJ's reliance on the November 2007 IQ scores was improper as those scores were not

sufficiently current for purposes of plaintiff's January 2011 SSI application.  *See Rabbers*, 582

F.3d at 651 (holding that "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right").

In addition, the ALJ's finding that plaintiff's IQ scores were not reliable due to

motivational, and not medical, factors lacks substantial support in the record.  There is no

medical opinion in the record questioning the validity of Dr. Heiskell's 2011 IQ test results—the

only sufficiently current results under the regulations.  The ALJ assumes, without any medical

opinion to support her assumption, that Dr. Heiskell's 2011 listing level test scores were the

product of plaintiff's lack of motivation.[10]  The only medical source to indicate that motivation

may have played a factor in IQ testing was Dr. Leisgang who examined plaintiff three years

earlier.  While the ALJ may have been justified in disregarding the full scale IQ score of 44

obtained by Dr. Leisgang in 2008 due to the motivational factors noted by Dr. Leisgang in her

report, the same cannot be said for the IQ scores obtained by Dr. Heiskell.  There is no indication

that plaintiff lacked motivation during testing with Dr. Heiskell.  Importantly, the ALJ failed to

heed the regulatory requirement to consider the narrative portion of Dr. Heiskell's report when

---

[10] The Supreme Court has explained that there are many reasons for the fluctuation in IQ test scores:

> An individual's IQ test score on any given exam may fluctuate for a variety of reasons.  These include the test-taker's health; practice from earlier tests; the environment or location of the test; the examiner's demeanor; the subjective judgment involved in scoring certain questions on the exam; and simple lucky guessing.

*Hall v. Florida*, 134 S.Ct. 1986, 1995 (2014).

assessing the validity of plaintiff's 2011 IQ test scores.  The regulations provide:

> The results of standardized intelligence tests may provide data that help verify the presence of intellectual disability . . . as well as the extent of any compromise in cognitive functioning.  However, since the results of intelligence tests are only part of the overall assessment, *the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation*.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(a) (emphasis added).   A review of Dr. Heiskell's report establishes that he deemed the test to be valid.  Dr. Heiskell explicitly opined that plaintiff's 2011 IQ scores were "valid insofar as they represent her current status."  (Tr. 472).  In giving his "reliability estimate," Dr. Heiskell stated that plaintiff's responses were internally consistent and consistent with her mother's description of plaintiff's behaviors.  (Tr. 472).  Dr. Heiskell also found that plaintiff's "[p]ersistence with mental status tasks was adequate overall, given her level of obvious irritability."  (Tr. 470).  Rather than motivational factors accounting for the decline in plaintiff's cognitive functioning, Dr. Heiskell attributed the decline in plaintiff's cognitive functioning from 2000 to 2003 to 2011 to "interference from [plaintiff's] severe emotional disturbance."  (Tr. 472).  As the medical evidence outlined above shows, examining and treating mental health professionals found significant limitations stemming from plaintiff's major depressive disorder, oppositional defiant disorder, ADHD, PTSD, dissociative identity disorder, OCD, and personality disorder NOS.  (Tr. 386, 464, 472, 536).  As there is no medical or psychological opinion questioning the reliability of Dr. Heiskell's test results, the ALJ's reliance on plaintiff's performance during testing in 2008 to disregard the only sufficiently current test results from 2011 is without substantial support in the record.

The ALJ also stated that the examiners who documented low IQ scores "refused to diagnose" mental retardation and noted plaintiff functioned within the borderline range of intelligence. (Tr. 19). As an initial matter, a formal diagnosis of mental retardation is not necessary to meet Listings 12.05 and 112.05. "There is no authority for the proposition that [a claimant] must be able to point to a *diagnosis* of mental retardation in order to satisfy [Listing 12.05]." *Lingo v. Colvin*, No. 3:13-cv-452, 2013 WL 6859870, at *5 (N.D. Ohio Dec. 29, 2013) (quoting *Thomas v. Comm'r of Soc. Sec.*, No. 08-cv-1365, 2010 WL 1254788, *11 (N.D. Ohio Mar. 25, 2010)); *see also Breitenstein v. Astrue*, No. 3:10-cv-32, 2011 WL 1235018, at *12 (S.D. Ohio Jan. 6, 2011) (Report and Recommendation) ("[I]nstead of requiring evidence of a diagnosis of mental retardation, the correct analysis focuses on whether the evidence of record meets or equals Listing 12.05's introductory paragraph and 12.05C's criteria."), *adopted*, 2011 WL1234902 (S.D. Ohio Mar. 30, 2011); *Wilkerson v. Comm'r of Soc. Sec.*, No. 3:08-cv-419, 2010 WL 817307, at *13 (S.D. Ohio Mar. 5, 2010) ("Requiring such a diagnosis in cases of mental retardation would place formalism over substantive evidence."). Although plaintiff's IQ scores were lower than Dr. Heiskell expected based on plaintiff's clinical presentation and Dr. Heiskell estimated that plaintiff's "[u]nderlying intellectual functioning likely optimally falls in the borderline range"[11] (Tr. 472), Dr. Heiskell nevertheless considered the scores to be a valid indication of plaintiff's current status; he stated plaintiff's responses were consistent with her clinical presentation; and he opined that her persistence with mental status tasks was adequate. These circumstances do not support the ALJ's finding of invalid scores. *See Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 456, 461-62 (6th Cir. 2012).

---

[11] Borderline intellectual functioning is usually associated with IQ scores of at least 70. *Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 456, 461 (6th Cir. 2012).

In *Dragon*, the claimant received academic instruction under an IEP for a developmental handicap and speech impairment. *Id.* at 456. She "never passed any of the ninth grade proficiency tests and was exempted because she '[did] not have the necessary skills to pass.'" *Id.* An examining psychologist administered the WAIS on which the claimant received a verbal score of 58, a performance score of 51, and a full scale score of 50, which were significantly lower than the scores she received on the WISC at the age of 12. *Id.* The examining psychologist indicated that the claimant's "tested I.Q. is lower than would be expected on the basis of clinical presentation. Emotional and motivational factors may have interfered with performance on this measure as [she] appears to be of borderline intelligence." *Id.* The Sixth Circuit held that substantial evidence did not support the ALJ's conclusion that the examining psychologist's statement that the scores were lower than expected completely invalidated those scores. *Id.* at 462. In so holding, the Sixth Circuit noted that the ALJ improperly ignored the examining psychologist's earlier observation that the claimant "did not appear to exaggerate or minimize her difficulties . . . [and] was adequately motivated." *Id.* The Sixth Circuit also held that the ALJ improperly disregarded the examining psychologist's "full evaluation, which served to reinforce the I.Q. scores, rather than undermine them." *Id.*

Like *Dragon*, Dr. Heiskell's full examination supports the validity of plaintiff's 2011 IQ score. Dr. Heiskell opined that plaintiff's performance was reliable as "she gave responses that appeared internally consistent, and which were consistent with her mother's descriptions of [plaintiff's] behaviors." (Tr. 472). Dr. Heiskell extensively documented plaintiff's mental and emotional impairments that he observed during the examination and testing. (*See* Tr. 468-71). While Dr. Heiskell had expected plaintiff's IQ score to be higher based on her clinical

29

presentation, he considered her IQ results "to be valid insofar as they represent her current status." (Tr. 472).

In addition, and similar to the claimant in *Dragon*, plaintiff's school records establish that her April 2011 IQ scores are consistent with her developmental history and degree of functional limitation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(a). Throughout her school years plaintiff's academic functioning and abilities were consistently and significantly behind those of her peers. (Tr. 274-76, 294, 303, 304, 370-71, 374-79, 381, 501, 502, 508, 511). When plaintiff was a senior in high school, she was reading at only a "lower second grade level" and was "computing math at a[n] 8th grade level." (Tr. 346). Plaintiff's participation in the Ohio Graduation Test was by alternate assessment, and she was excused from the consequences of not passing the test. (Tr. 354). Plaintiff received academic instruction under an IEP in a self-contained classroom for students with multiple disabilities based on her educational disability of "Mental Retardation/Mentally Impaired/Intellectually Limited." (Tr. 226, 354). Thus, substantial evidence does not support the ALJ's conclusion that the lack of a diagnosis of mental retardation invalidated otherwise valid, qualifying IQ scores for purposes of Listings 12.05 and 112.05.

Finally, the 2011 IQ scores are generally consistent with other IQ scores plaintiff obtained over the years. Taking the lowest IQ score in the series as directed by the regulations, plaintiff's IQ was 71 in 2000, 59 in 2003, 77 in 2007, 44 in 2008, and 50 in 2011. Thus, over an eight-year period, plaintiff had 3 scores of 59 or less for purposes of listings 12.05B and 112.05C. Moreover, plaintiff's score of 71 in 2000 would fall within an interval of approximately 66 to 76, which is within the range of scores to qualify under listings 12.05C and 112.05D with another "mental impairment imposing an additional and significant work-related

30

limitation of function." *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.05C, 112.05D; *Hall*, 134 S.Ct. at 1995 (explaining that an IQ "score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence"). In focusing on plaintiff's non-qualifying score in 2007, the ALJ improperly ignored the four other IQ scores in the record, which were spread over an eleven-year period. *See Lingo*, 2013 WL 6859870, at *4 ("[F]ocusing on the non-qualifying IQ score to the exclusion of other evidence that may be relevant to the age-of-onset requirement is inconsistent with the substantial evidence standard."); *Boyd v. Astrue*, No. 09-4619, 2011 WL 1004562, at *4 (E.D. Pa. Mar. 18, 2011) ("The ALJ, on remand, should consider all evidence, including all three I.Q. tests on record and Boyd's school records, to make a factual finding as to whether Boyd's mental condition equals Listing 12.05(C).").[12]

The Commissioner relies on the Court's opinion in *Griffey v. Astrue*, No. 1:08-cv-786, 2009 WL 4396520 (S.D. Ohio Dec. 1, 2009), as support for the ALJ's decision to discount plaintiff's qualifying IQ scores. (Doc. 15 at 15). That reliance is misplaced. In *Griffey*, the claimant graduated from high school in 1972 and applied for disability benefits in 2003. *Griffey*, 2009 WL 4396520, at *1. In 1996, the claimant received a verbal IQ score of 69 and a full scale IQ score of 70. *Id.* at *2. In 2006, an examining state-agency psychologist administered an additional IQ test, on which the claimant received a verbal score of 52, a performance score of 52, and a full scale score of 48. *Id.* The examining psychologist believed those scores "were very likely unreliable." *Id.* at *6. In affirming the denial of disability benefits, this Court found that "[t]he wide discrepancy between the two tests given ten years apart is further evidence of the

---

[12] The Commissioner contends that plaintiff ignores the "medical opinions of the state agency doctors—made after all the IQ tests in the record—which concluded that plaintiff does not meet or equal Listings 112.05 or 12.05" (Doc. 15 at 19). However, the state agency reviewers' reports do not comment on or give any indication that they considered whether plaintiff met or equaled Listings 112.05 and 12.05 despite listing level IQ scores. (Tr. 76, 85).

questionable validity of the later tests." *Id.* This Court also found that the claimant had failed to establish that she met the introductory requirement of Listing 12.05 of "deficits in adaptive functioning before age 22." *Id.*

Unlike the claimant in *Griffey*, plaintiff received three scores that qualified under Listing 12.05B (59 in 2003, 44 in 2008, and 50 in 2011) and one score that arguably qualified under Listing 12.05C (71 in 2000, which represents a range of 66 to 76), given plaintiff's numerous additional mental impairments. Thus, plaintiff had four tests that were consistent in qualifying her for disability under Listings 12.05 and 112.05. Under the logic of *Griffey*, the wide discrepancy of plaintiff's score of 77 in 2007 from her other results would render that result of questionable validity, not her four other results that were consistent with a finding of intellectual disability. *See id.* at *6. Further, unlike the claimant in *Griffey*, and as explained below, substantial evidence establishes that plaintiff has met her burden of showing she satisfies the threshold requirement of "deficits in adaptive functioning initially manifested . . . before age 22." In addition, plaintiff obtained some of her qualifying scores long before she applied for disability benefits, strongly suggesting there was no financial incentive to minimize her level of intellectual functioning. Finally, unlike the claimant in *Griffey*, who obtained both IQ results as an adult, plaintiff obtained all of her IQ scores before the age of 18, and she received 4 of those scores before the age of 16, when a person's IQ "tend[s] to stabilize." *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10). The ALJ's reliance on a result from 2007, which was not sufficiently current for purposes of the Commissioner's own regulations, was improper and is another characteristic that distinguishes plaintiff's case from *Griffey*.

For the reasons stated above, the ALJ's reliance on the alleged "unreliability" of plaintiff's IQ tests, the perceived lack of motivation during testing, and recent IQ scores "near

32

the upper end of the borderline range" (Tr. 19) does not provide substantial support for disqualifying plaintiff's listing level IQ scores.

The Commissioner further argues that aside from whether has valid IQ scores for purposes of Listings 112.05 and 12.05, plaintiff has not demonstrated significantly subaverage general intellectual functioning and the deficits in adaptive functioning necessary to satisfy these listings. (Doc. 15 at 14). The Commissioner contends that the ALJ's discussion of plaintiff's activities of daily living, social functioning, and other inconsistencies between her allegations and the evidence provide substantial support for a finding that plaintiff does not have deficits in adaptive functioning. (*Id.*).

Contrary to the Commissioner's argument, the record evidence demonstrates plaintiff's significantly subaverage general intellectual functioning before the age of 22 for purposes of Listings 112.05 and 12.05. Elementary school records show plaintiff received "extremely low" scores on the Wechsler Individual Achievement Test ("WIAT") in the areas of reading, mathematics, writing, and spelling.[13] (*See* Tr. 370, 385). Specifically, in 2003 when plaintiff was 10, she received a reading score of 50, a numerical operations score of 67, and a spelling score of 47, all of which were "extremely low." (Tr. 370). The 2003 WIAT results placed plaintiff in less than the 0.1 percentile for reading, the first percentile for numerical operations, and greater than the 0.1 percentile for spelling. (*Id.*). A school psychologist report from 2006 concluded that plaintiff "will perform academically at a level significantly below that of same-aged peers" and that her "cognitive ability will likely have an adverse effect on her academic performance." (Tr. 502). In 2007, plaintiff received "very low" scores in all subject areas on the WJTA, indicating she was performing at a first grade level in reading and writing and a fourth

---

[13] Scores on the WIAT have a mean of 100 and a standard deviation of 15. (*See* Tr. at 385).

grade level in mathematics.  (*See* Tr. 377).  Educational diagnostician Lentes concluded that plaintiff's "academic skills, and her fluency with those skills, are negligible."  (Tr. 377).  Additional testing in 2007 yielded WIAT results that were "significantly below average."  (*Id.*).  Dr. Dearth reported that plaintiff endorsed significantly greater than average difficulties in cognitive function, academic performance, oppositional attitudes and limit testing, family discord, psychological distress, social withdrawal, social skills, and social awareness.  (Tr. 386).  Dr. Dearth found that these difficulties were consistent with plaintiff's prior clinical presentation.  (*Id.*).

In addition to these test results, school records also indicate that plaintiff's general intellectual functioning was "significantly subaverage" before the age of 22.  For example, in the ninth grade, plaintiff was reading at just below the first grade level and was computing math at the fifth grade level.  (*See* Tr. 311).  Further, her individualized education program reevaluation indicated that she had a "significant" and "severe" cognitive delay.  (Tr. 501).  In the eleventh grade, plaintiff was reading at a first grade level, computing math at a fourth grade level, and writing at the level of a kindergartner.  (Tr. 218).  She received all of her academic instruction that year in a self-contained special education classroom that had two teachers for eight students with multiple disabilities.  (Tr. 218-19).  As a senior in high school, plaintiff was reading at a "lower second grade level" and was "computing math at a[n] 8th grade level."  (Tr. 346).  Further, plaintiff's participation in the Ohio Graduation Test was by alternate assessment, and she was excused from the consequences of not passing the test.  (Tr. 354).  To justify this exemption, plaintiff's IEP indicated that "[s]he receives all her classes in the [Multiple Disabilities] classroom and her curriculum is significantly altered from her peers."  (*Id.*).  *See Dragon*, 470 F. App'x at 456, 461 (holding that ALJ lacked substantial evidence to conclude that

claimant had failed to establish "significantly subaverage general intellectual functioning with deficits in adaptive functioning" where claimant participated in a separate educational program and was exempted from state proficiency tests because she did "not have the necessary skills to pass"). Thus, contrary to the Commissioner's contention, the evidence supports plaintiff's significantly subaverage general intellectual functioning before the age of 22.

The Commissioner also contends that plaintiff has not met her burden of showing she satisfies the threshold listing requirement of "deficits in adaptive functioning." The Commissioner asserts that contrary to plaintiff's argument the ALJ did not concede this issue, "particularly in light of the ALJ's credibility discussion of [p]laintiff's activities of daily living, social functioning and other inconsistencies between allegations and the evidence." (Doc. 15 at 14).

"*Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV at 42. "Adaptive functioning" includes the plaintiff's "effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). Mental retardation requires concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. DSM-IV at 49.

To the extent the ALJ determined that plaintiff did not meet the listing requirement of deficits in adaptive functioning, that finding is not supported by substantial evidence. Plaintiff's

school records amply document plaintiff's deficits in adaptive functioning that manifested during her developmental years.  *See, e.g.*, Tr. 371 (plaintiff's social skills were "not age appropriate" and she had "difficulty with initiating communication appropriately including greetings and closings, turn taking, remaining on topic, and asking/answering questions appropriately); Tr. 501 (plaintiff demonstrated "severe and significant deficits in adaptive behavior and communication for a student of her age"); Tr. 508 (documenting numerous deficits in plaintiff's ability to independently perform activities in area of communication, socialization, and self-direction, and in area of independent functioning); Tr. 511 (plaintiff "will need a lot of help" to live independently as an adult).  In addition, test results indicate plaintiff had deficits in adaptive functioning before the age of 22.  In 2003 when plaintiff was 10, she obtained a general adaptive composite score of 71 on the Adaptive Behavior Assessment System ("ABAS").  (Tr. 308).  Plaintiff's ABAS results showed deficits in the areas of communication, community use, functional academics, and self-direction.  Further, these results indicated that she was functioning at the 2.7 percentile compared to her same-age peers.  (*Id.*).  Additionally, in 2007 when plaintiff was 13 years and 8 months old, she received an adaptive behavior composite score of 78 on the VABS.  (Tr. 380).  This score was "moderately low," placing plaintiff in the seventh percentile as compared to her age-level peers.  (Tr. 381).  She received moderately low scores in all subsets of communication, daily living skills, and socialization, except for receptive communication and play and leisure time for which she received "adequate" scores.  (Tr. 380-81).

The Commissioner asserts, without explanation, that plaintiff's "moderately low" VABS scores are "insufficient to document a listings level intellectual disability."  (Doc. 15 at 14 n.13).  The Commissioner's argument suggests that plaintiff must show "significant" or "marked"

deficits in adaptive functioning. However, the plain language of Listings 112.05 and 12.05—

which requires "deficits in adaptive functioning"—does not specify how severe the deficits must

be.[14] Under the Social Security regulations, "loss of adaptive functioning" is "manifested by

difficulties in performing activities of daily living, maintaining social relationships, or

maintaining concentration, persistence, or pace." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00C4.

The ALJ determined that plaintiff, who had not attained the age of 22 as of the alleged onset

date, has moderate-to-marked difficulties in social functioning and moderate limitations in

concentration, persistence and pace. (Tr. 31). Although the ALJ determined that these moderate

limitations did not preclude work that was simple, routine and repetitive or that required

infrequent and minimal interaction with the co-workers or supervisors, such abilities are not

necessarily inconsistent with Listing 12.05C. *See Brown v. Sec. of HHS,* 948 F.2d 268, 270 (6th

Cir. 1991) (full scale IQ of 68 not inconsistent with obtaining driver's license and work history

as a truck driver, limited literacy and sixth grade education, and ability to make change, do

laundry and clean his room); *Wilson v. Astrue,* No. 07–439, 2009 WL 69237, at *5 (E.D. Ky.

Jan. 9, 2009) (claimant's ability to sustain concentration and interact with others not inconsistent

with listing 12.05C); *Muntzert v. Astrue,* 502 F. Supp.2d 1148, 1157-58 (D. Kan. 2007) ("DSM–

IV and Listing 12.05(C) assume many, if not most, mildly mentally retarded individuals will be

able to work. However, they recognize that some mildly mentally retarded individuals may be

unable to work where they have 'a physical or other mental impairment imposing an additional

and significant work-related limitation of function.'"). *See also Grenham v. Astrue,* No. 08-cv-

11151, 2009 WL 1209026, at *5 (D. Mass. May 4, 2009) ("the Listings reflect this reality [that a

---

[14] Indeed, if the diagnostic description for Listing 12.05 requires more than moderate deficits of adaptive functioning as the Commissioner suggests, Listing 12.05D—which requires an IQ of 60 through 70 and marked restrictions in at least two areas of mental functioning—would be rendered superfluous.

person with mild mental retardation may be able to work and maintain a household], as they require a claimant to demonstrate another impairment apart from mild mental retardation before they can be found disabled") (citing *Nieves v. Sec'y of HHS,* 775 F.2d 12, 14 (1st Cir. 1985)).

Nevertheless, the Commissioner argues that more recent evidence demonstrates that plaintiff did not demonstrate deficits in social functioning, including school records from 2007 and 2011 from plaintiff's special education teachers, which show plaintiff had no vocabulary, speech, or other specified social functioning problems during the school year.  (Doc. 15 at 19, citing Tr. 27, 35, 221, 378).  Although the ALJ cited to these reports as evidence suggesting a less than marked impairment in plaintiff's social functioning, the ALJ ultimately agreed with the state agency psychologists that plaintiff demonstrated "marked" impairment in interacting and relating to others.  (Tr. 27:  "While the evidence regarding this functional domain was mixed and there was considerable evidence indicating less than marked limitations [in] interacting and relating with others, Drs. Rivera and Hoffman nevertheless opined that the claimant had marked limitations in this functional domain (Exhibits 1A; 3A).  The undersigned therefore resolved this issue in favor of the claimant given the agreement between both Dr. Rivera and Dr. Hoffman. . . .").  This evidence of a "marked" impairment in social functioning amply demonstrates plaintiff's deficits in adaptive functioning for purposes of the listing requirement.

Moreover, when the evidence cited by the Commissioner is viewed in the context of plaintiff's school records as a whole, this evidence does not provide substantial evidence to support the conclusion that plaintiff did not have deficits in adaptive functioning that manifested before age 22.  The ALJ stated that plaintiff's socialization was a strength, citing to the observations of Ms. Kitts, plaintiff's eleventh grade special education teacher, that plaintiff "had no problems interacting and relating with others in her self-contained classroom" for individuals

38

with multiple disabilities and exhibited "excellent behavior" at school.  (Tr. 27, citing Tr. 221, 225, 346).  However, the ALJ ignores Ms. Kitts's qualification concerning plaintiff's behavior that her "behavior would become an issue" if plaintiff "were moved [from the Multiple Disabilities classroom] to the cognitive disabilities classroom."  (Tr. 225).  While the Commissioner also suggests that Ms. Kitts's records show improvement in plaintiff's adaptive functioning, there is no indication from the ALJ's decision that she considered how plaintiff's structured environment (i.e., the self-contained multiple disabilities classroom), supportive services (e.g., sharing two full-time teachers with only seven other students), and altered curriculum and assessment methods may have influenced Ms. Kitts's questionnaire responses or the ALJ's own assessment of plaintiff's level of functioning.

The Social Security regulations require the ALJ to examine how much extra help a child needs and the effects of structured or supportive settings.  *See* 20 C.F.R. § 416.926a(a)(1).  The regulations provide:

> A structured or supportive setting may minimize signs and symptoms of your impairment(s) and help to improve your functioning while you are in it, but your signs, symptoms, and functional limitations may worsen outside this type of setting.  Therefore, *we will consider your need for a structured setting and the degree of limitation in functioning you have or would have outside the structured setting*.  Even if you are able to function adequately in the structured or supportive setting, we must consider how you function in other settings and whether you would continue to function at an adequate level without the structured or supportive setting.

20 C.F.R. § 416.924a(b)(5)(iv)(C) (emphasis added).  *See also* Soc. Sec. Ruling 09-1p, Section III (recognizing that a child who "needs a person, medication, treatment, device, or structured, supportive setting to make [her] functioning possible or to improve the functioning" is not "as independent as same-age peers who do not have impairments"); 20 C.F.R. § 416.924a(b)(7)(iv) ("[G]ood performance in a special education setting does not mean that [a child is] functioning at

the same level as other children [her] age who do not have impairments.").  Specifically, the ALJ's decision reflects no recognition whatsoever of the special education assistance plaintiff received, including her placement in the multiple disabilities classroom, small group instruction, one-on-one instruction in the classroom, extended time on all academic activities, shortened assignments, modified tests, the use of a calculator, and the services of a scribe.  (*See* Tr. 274-75, 303, 312-16).  Although Ms. Kitts's questionnaire responses suggest plaintiff's adaptive functioning may have improved within the structured environment of the Multiple Disabilities classroom and that plaintiff was learning occupational skills and life skill words to assist her after high school, Ms. Kitts nevertheless concluded that plaintiff "would not be able to live independently."  (Tr. 225).

The evidence described above, including the evaluations from the examining doctors, test scores, and teacher assessments, demonstrates that plaintiff has deficits in adaptive functioning that manifested before age 22 for purposes of Listings 12.05 and 112.05.  The Commissioner's argument to the contrary is without substantial support in the record.

For these reasons, the Court finds the ALJ's decision that plaintiff's intellectual functioning did not meet or equal the requisite criteria of Listings 12.05B, C or 112.05C, D is not supported by substantial evidence and should be reversed.  Accordingly, plaintiff's assignment of error should be sustained.

## III.  This matter should be reversed and remanded for an award of benefits.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted.  The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  42 U.S.C. § 405(g); *Melkonyan v.*

*Sullivan*, 501 U.S. 89, 98 (1991).

Benefits may be immediately awarded "if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec. of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec. of H.H.S.*, 820 F.2d 777, 782 (6th Cir. 1987).  The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming.  *Faucher*, 17 F.3d at 176.  *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

In this case, the proof of disability under Listings 12.05 and 112.05 is strong and evidence to the contrary is lacking in substance.  The evaluations from the examining doctors and psychologists, the IQ and other test scores, and the teacher assessments demonstrate that plaintiff has significantly subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested before the age of 22 for purposes of meeting Listings 12.05B and 112.05C.  The evidence also establishes plaintiff has other mental impairments imposing additional and significant work related limitation of function for purposes of Listings 12.05C and 112.05D.  (Tr. 18, Finding of Fact 3).  The only evidence to the contrary that the ALJ considered in finding that plaintiff did not meet the listings for intellectual disability were stale IQ scores that the ALJ should not have considered under the Social Security regulations because they were obtained before plaintiff's IQ had stabilized.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(D)(10); *see also Rabbers*, 582 F.3d at 651.  Accordingly, it is

recommended that the ALJ's decision be reversed and the case be remanded for an award of benefits.[15]

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **REVERSED** and this case be **REMANDED** for an award of benefits pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date:   12/7/2015              s/Karen L. Litkovitz
                               Karen L. Litkovitz
                               United States Magistrate Judge

---

[15] Because the undersigned determines that plaintiff qualifies as disabled under the listings, the Court need not reach plaintiff's other assignments of error.  *See* 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step."); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) ("During the sequential evaluation, if the claimant is found to be conclusively disabled or not disabled, the disability determination is made, and the inquiry is ended.").

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

TERRIE CRAIG,                                    Case No. 1:14-cv-966
     Plaintiff,                                 Beckwith, J.
                                                 Litkovitz, M.J.

     vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.


### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).